Filed 7/30/26  P. v. Li CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUN LI,<br><br>    Defendant and Appellant. | H052909<br>(Santa Clara County<br> Super. Ct. No. C1904784) |

A jury convicted defendant Jun Li of 10 crimes, including special circumstance murder and rape in concert.  The trial court sentenced Li to life in prison without the possibility of parole, consecutive to 25 years to life, consecutive to 21 years.

Li asserts the trial court erred in instructing the jury on felony murder and the robbery-murder special circumstance and in failing to award him pretrial custody credits on all counts of conviction.  Li also requests that we dismiss allegations that were alleged in his indictment but were not submitted to the jury and correct errors in the abstract of judgment.

For the reasons explained below, we order corrections to the award of pretrial custody credits and to the abstracts of judgment and affirm the judgment as modified.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

On November 19, 2020, the Santa Clara County District Attorney filed a first amended indictment (indictment) charging Li with 10 crimes:  (1) murder of Xingjian Li (Pen. Code,[1] § 187, subd. (a); count 1) with a robbery-murder special circumstance (§ 190.2, subd. (a)(17)); (2) second degree robbery (§ 212.5, subd. (c); count 2); (3) rape of X. Doe[2] in concert (§ 264.1, subd. (a); count 3), with "One Strike" law allegations[3] that the offense was committed during a burglary (§ 667.61, subds. (a) & (d)), that Li personally used a firearm during the commission of the offense (§§ 667.61, subds. (b) & (e), 12022.53), that Li engaged in tying or binding of the victim during the commission of the offense (§ 667.61, subds. (b) & (e)), and that Li committed sexual offenses against more than one victim (§ 667.61, subd. (e)); (4) oral copulation of X. Doe in concert by force or fear (§ 288a, subd. (d)(1); count 4), with One Strike law allegations that the offense was committed during a burglary (§ 667.61, subds. (a) & (d)), that Li personally used a firearm during the commission of the offense (§§ 667.61, subds. (b) & (e), 12022.53), that Li engaged in tying or binding of the victim during the commission of the offense (§ 667.61, subds. (b) & (e)), and that Li committed sexual offenses against more than one victim (§ 667.61, subd. (e)); (5) robbery of an inhabited place in

---

[1] All further unspecified statutory references are to the Penal Code.

[2] The indictment identified the victim by her first name and the pseudonym "Doe."  We refer to this victim and other victims in the case by the first initial of their first names and other persons by their initials to protect personal privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4), (10).)

[3] "California's 'One Strike' law, codified at Penal Code section 667.61, is an alternative sentencing scheme that applies when the prosecution pleads and proves specific aggravating circumstances in connection with certain sex offenses."  (*In re Vaquera* (2024) 15 Cal.5th 706, 712 (*Vaquera*).)

concert (§ 213, subd. (a)(1)(A); count 5), with an allegation that Li personally used a firearm during the commission of the offense (§ 12022.53, subd. (b)); (6) robbery of an inhabited place in concert (§ 213, subd. (a)(1)(A); count 6); (7) first degree burglary (§ 460, subd. (a); count 7), with an allegation that a person not an accomplice was present during the burglary (§ 667.5, subd. (c)(21)); (8) kidnapping of S. Doe (§ 207, subd. (a); count 8); (9) robbery of an inhabited place in concert (§ 213, subd. (a)(1)(A); count 9); and (10) conspiracy to commit robbery (§ 182, subd. (a)(1); count 10).

Li's jury trial began on September 3, 2024. On November 14, 2024, the jury found Li guilty of count 1 (first degree murder) and found true the special circumstance (§ 190.2, subd. (a)(17)) and a reckless indifference/major participant allegation (§ 190.2, subd. (d) (section 190.2(d))), guilty of count 2, guilty of count 3 and found true the One Strike law allegations of commission during a burglary, personal use of a firearm, and binding the victim, guilty of count 4 and found true the One Strike law allegations of commission during a burglary, personal use of a firearm, and binding the victim, guilty of count 5 and found true the allegation of personal use of a firearm, guilty of count 6, guilty of count 7 and found true the allegation of the presence of a person not an accomplice, guilty of count 8, guilty of count 9, and guilty of count 10.

On December 13, 2024, the trial court sentenced Li to life without the possibility of parole, consecutive to 25 years to life, consecutive to 21 years.

Li timely appealed.

B. *Prosecution's Trial Evidence*[4]

An Yan testified that in August 2017,[5] he responded to a social media post promising an opportunity to make a " 'quick buck.' " About one week later, Yan met with Panpan Huang. Huang explained that the job involved forcibly collecting debts from Chinese women who owed Huang money for immigration assistance and who currently worked as prostitutes. The plan involved entering the brothels where the women worked, subduing them, and signaling Huang to enter so that he could collect the money owed him. At a second meeting between Yan and Huang, Jason Shen participated in a discussion of the plan.

In September 2017, Yan, Huang, and Shen, along with defendant Li and Lin Tao traveled in a van from southern California to northern California. Huang and Shen led the operation. The group possessed two handguns (which belonged to Huang and Shen), a stun gun, zip ties, masks, gloves, electric hair clippers, and backpacks. According to Yan, Shen told the group that if someone resists, fire "one shot" at a couch or pillow. Shen and Huang further instructed that "if somebody got hurt" in the shooting, the group "needed to kill everybody" because "they didn't want any witnesses." Shen and Huang repeated this instruction to the group approximately three to four times.

---

[4] Li did not present any witnesses in his defense. After the prosecution rested its case, Li's defense counsel read the following stipulation to the jurors and then rested: "An Yan did not make any statements, conduct any interviews, or provide any testimony about real or fake guns between his 2019 testimony and his 2022 testimony."

[5] Unless otherwise indicated, all dates were in 2017.

a. Milpitas Incident (counts 8 & 9)

On the morning of September 27, Li and Tao entered an apartment in Milpitas. Li had a handgun, and Tao had a stun gun. They bound, blindfolded, and shocked S. Doe. Yan entered the apartment with a handgun and eventually advised Huang and Shen that the apartment was secure.

Huang and Shen entered the apartment wearing ski masks. Someone pressed something against S. Doe's head and threatened to kill her if she did not tell the men the location of the money. The men took money from S. Doe's pocket. At Huang's request, Li and Yan dragged S. Doe into a bedroom. Huang raped S. Doe. He penetrated her with his penis, his fingers, and an eggplant supplied by Yan. Shen shaved off S. Doe's hair. Shen took S. Doe's ATM card and cash from her wallet. Shen demanded that S. Doe provide her ATM card PIN.

Shen later used S. Doe's ATM card to withdraw cash from her bank account. After the group got some food, Shen and Li purchased $1,818 worth of merchandise at an Apple Store, while Yan, Huang and Tao went to a CVS.

b. South San Francisco Incident (counts 6 & 7)

Later, on the afternoon of September 27, the group traveled to an apartment in South San Francisco. Li, Yan, and Tao posed as customers and entered the apartment possessing zip ties and armed with handguns and a stun gun. The trio used their guns to force the brothel's "auntie," a sex worker, and a customer into a bedroom. Li, Yan, and Tao bound the victims and covered their eyes with tape. The trio also bound and blindfolded another sex worker and customer who were in a separate bedroom. Yan disabled the security cameras.

After Yan informed Huang that the apartment was secure, Huang and Shen entered wearing masks. Huang raped and sexually assaulted one of the

5

sex workers while Li watched. In addition, Shen sexually assaulted this victim and shaved off some of her hair. Yan sexually assaulted the other sex worker.

The group searched the apartment for money and valuables. Shen took envelopes of cash found in the kitchen, as well some luggage and a backpack.

The group subsequently went to get some food and cigarettes, which they purchased using S. Doe's ATM card.

### c. Fremont Incident (counts 3, 4 & 5)

The next day (September 28), the group drove to an apartment in Fremont. Li, Yan, and Tao were armed with handguns and a stun gun. The brothel's "auntie" (Y.W.) let Li, Yan, and Tao into the apartment. They bound Y.W. and two sex workers and covered Y.W.'s head with a towel.

After Yan advised Huang that the apartment unit was secure, Huang and Shen entered the apartment wearing masks. Yan saw Li "holding up" one of the sex workers; Li demanded the victim's money, passwords, and information concerning her bank cards. Tao beat X. Doe, raped her, and forced her to orally copulate him. Yan witnessed Huang and Shen digitally penetrate X. Doe while Tao forced her to orally copulate him. Li put his fingers inside X. Doe's vagina. One of the men pressed a gun against X. Doe's head and raped her without wearing a condom. In addition, the men shocked X. Doe with the stun gun and cut off some of her hair.

The group took a purse, cash, cell phones, a laptop, an iPad, and bank cards from the apartment. Huang used one of the bank cards to purchase a wallet at a Louis Vuitton store.

### d. San Jose Incident (counts 1 & 2)

Later that same day (September 28), the group went to a San Jose apartment brothel run by Y.G. and Xingjian Li.

6

Yan testified that Shen had previously scouted this brothel. Before Yan, Li, and Tao entered the apartment on September 28, Shen told them that they would encounter two men inside and "[i]f they were to resist and if it would become necessary, shooting would be allowed." Shen reiterated that if any of the occupants of the brothel were shot, the men should shoot all the occupants so that there would be no witnesses. Huang then gave his gun to Li, and Shen gave his gun to Tao.

Yan entered the apartment posing as a customer. Soon after, Li and Tao also entered. Li and Tao drew guns and bound Y.G. and Xingjian Li with zip ties. Tao beat Y.G. and asked where the brothel's money was kept. Li and Tao forced two sex workers into the living room at gunpoint and Yan bound their wrists with zip ties. While Li and Tao searched the bedrooms for money, Xingjian Li freed himself. Tao came out of a bedroom and shot Xingjian Li as he tried to jump toward the kitchen. After shooting Xingjian Li, Tao said, " 'Fuck you. You thought I wouldn't dare to shoot at you?' " While Xingjian Li lay wounded on the kitchen floor, Yan bound him again with zip ties. Li, Tao, and Yan left the apartment with suitcases and backpacks belonging to the sex workers. Thereafter, Y.G. approached Xingjian Li as he lay on the kitchen floor. Xingjian Li died from the gunshot wound.

Later, Shen found over $1,000 inside the suitcases.

## II. DISCUSSION

A. *Alleged Instructional Error*

Li contends the trial court committed prejudicial error by incorrectly omitting the objective element of reckless indifference to human life from the instructions on felony murder and the robbery-murder special circumstance. Li asserts that the court's definition of reckless indifference did not "permit

7

the jury to consider whether a law-abiding person would know" that the conduct underlying the robbery carried a grave risk of death. (Boldface & italics omitted.)

The Attorney General responds that Li forfeited his claim of error by stipulating to the jury instructions and failing to request clarifying language. The Attorney General further asserts that Li's claim lacks merit under precedent that addresses the meaning of reckless indifference to human life and, regardless, any error was harmless beyond a reasonable doubt.

### 1. Additional Background

After discussion of the proposed jury instructions, the trial court stated that "the parties stipulate to the instructions given, instructions not given, and the wording of the instructions given." There is no indication in the record that Li's defense counsel requested any language clarifying the phrase "reckless indifference to human life," as defined in the trial court's proposed versions of CALCRIM No. 540B (CALCRIM 540B) and CALCRIM No. 703 (CALCRIM 703).

Regarding Li's liability for murder (count 1), the trial court instructed the jurors solely on first degree felony murder. The court used a version of CALCRIM 540B that read as follows:

"The defendant is charged in [c]ount 1 with murder, under a theory of first degree felony murder. [¶] The defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call this other person the perpetrator.

"To prove the defendant is guilty of first degree murder under this theory, the People must prove: [¶] 1. The defendant committed, aided and abetted, or was a member of a conspiracy to commit robbery, as charged in [c]ount 2; [¶] 2. The defendant intended to commit, intended to aid and abet

8

the perpetrator in committing, or intended that one or more of the members of the conspiracy commit robbery;  [¶]  3. If the defendant did not personally commit robbery, then a perpetrator, whom the defendant was aiding and abetting, or with whom the defendant conspired, committed robbery;  [¶]  4. While committing robbery, the perpetrator caused the death of another person;  [¶]  5. The defendant was a major participant in the robbery;  [¶] AND  [¶]  6. When the defendant participated in the robbery, he acted with reckless indifference to human life.

"To decide whether the defendant and the perpetrator committed robbery, as charged in [c]ount 2, please refer to the separate instructions that I give you on that crime.  To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I give you on aiding and abetting.  To decide whether the defendant was a member of a conspiracy to commit a crime, please refer to the separate instructions that I give you on conspiracy.  You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

"The defendant must have intended to commit, or aid and abet, or been a member of a conspiracy to commit the felony of robbery, before or at the time of the death.  [¶]  It is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the felony.  [¶]  It is not required that the person killed be the victim of the felony.  [¶]  It is not required that the defendant be present when the act causing the death occurs.  [¶]  You may not find the defendant guilty of felony murder unless all of you agree that the defendant or a perpetrator caused the death of another.  You do not all need to agree, however, whether the defendant or a perpetrator caused that death.

*"A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.*[6]

"When you decide whether the defendant acted with reckless indifference to human life, consider all the evidence.  No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life.  Among the factors you may consider are:  [¶]  Did the defendant know that a lethal weapon would be present during the robbery, as charged in [c]ount 2?  [¶]  Did the defendant know that a lethal weapon was likely to be used?  [¶]  Did the defendant know that a lethal weapon was used?  [¶]  Did the defendant know the number of weapons involved?  [¶]  Was the defendant near the person killed when the killing occurred?  [¶]  Did the defendant have an opportunity to stop the killing or to help the victim?  [¶]  How long did the crime last?  [¶]  Was the defendant aware of anything that would make a coparticipant likely to kill?  [¶]  Did the defendant try to minimize the possibility of violence?

"When you decide whether the defendant was a major participant, consider all the evidence.  No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant was a major participant.  Among the factors you may consider are:  [¶]  What was

---

[6] By the time of Li's 2024 trial, the Judicial Council had revised the italicized sentence from CALCRIM 540B.  As of September 2023, CALCRIM 540B states in a bracketed sentence (which "can be given" when reckless indifference under section 189, subdivision (e)(3) applies):  "A person acts with reckless indifference to human life when he or she engages in criminal activity that a reasonable person would know involves a grave risk of death and he or she knows that the activity involves a grave risk of death." (CALCRIM No. 540B (Sept. 2023 rev.), italics omitted.)

the defendant's role in planning the crime that led to the death? [¶] What was the defendant's role in supplying or using lethal weapons? [¶] What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participants? [¶] Was the defendant in a position to facilitate or to prevent the death? [¶] Did the defendant's action or inaction play a role in the death? [¶] What did the defendant do after lethal force was used?" (Italics added & omitted.)

The trial court additionally instructed the jurors that if they "find a defendant guilty of first degree murder, [they] must also decide whether the People have proved that the special circumstance is true." The court instructed the jurors on the robbery-murder special circumstance allegation with a version of CALCRIM 703 as follows:

"If you decide that a defendant is guilty of first degree murder but was not the actual killer, then when you consider the special circumstance of whether the murder was committed while the defendant, Jun Li, was engaged in or was an accomplice in the commission, or the immediate flight after the commission, of a felony, robbery, as charged in [c]ount 2, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

"In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor or a member of a conspiracy, the People must prove either that the defendant intended to kill, or the People must prove all of the following: [¶] 1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; [¶] AND [¶] 3. When the defendant participated in the crime, he acted with reckless indifference to human life.

11

*"A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.*[7]

"The People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for this special circumstance to be true.

"When you decide whether the defendant acted with reckless indifference to human life, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life. Among the factors you may consider are: [¶] Did the defendant know that a lethal weapon would be present during the robbery, as charged in [c]ount 2? [¶] Did the defendant know that a lethal weapon was likely to be used? [¶] Did the defendant know that a lethal weapon was used? [¶] Did the defendant know the number of weapons involved? [¶] Was the defendant near the person killed when the killing occurred? [¶] Did the defendant have an opportunity to stop the killing or to help the victim? [¶] How long did the crime last? [¶] Was the defendant aware of anything that would make a coparticipant likely to kill? [¶] Did the defendant try to minimize the possibility of violence?

"When you decide whether the defendant was a major participant, consider all the evidence. No one of the following factors is necessary, nor is

---

[7] The trial court did not use the then-current version of CALCRIM 703 for the italicized sentence. Like CALCRIM 540B, as of September 2023, CALCRIM 703 states in a bracketed sentence: "A person acts with reckless indifference to human life when he or she engages in criminal activity that a reasonable person would know involves a grave risk of death and he or she knows that the activity involves a grave risk of death." (CALCRIM No. 703 (Sept. 2023 rev.), italics omitted.)

12

any one of them necessarily enough, to determine whether the defendant was a major participant. Among the factors you may consider are: [¶] What was the defendant's role in planning the crime that led to the death? [¶] What was the defendant's role in supplying or using lethal weapons? [¶] What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participants? [¶] Was the defendant in a position to facilitate or to prevent the death? [¶] Did the defendant's action or inaction play a role in the death? [¶] What did the defendant do after lethal force was used?

"If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for this special circumstance to be true. If the People have not met this burden, you must find this special circumstance has not been proved true." (Italics added & omitted.)

During his closing argument, regarding count 1, the prosecutor asserted that in "committing the robbery or aiding and abetting the robbery, [Li] was a major participant in it. Wasn't just a bystander. Wasn't someone who was just the get-away driver or who got some of the loot afterwards. He was part and parcel, and there can be no more major participant in a robbery than someone who goes in armed with a gun, someone who is punching, yelling, ordering, [and] tying people up. All of that that Jun Li did with all the others, that's being a major participant, and he acted with reckless indifference to human life. [¶] That reckless indifference was completed the moment he stepped through the threshold with that gun, knowing Jason Shen and Panpan Huang's orders, knowing that they were told how to deal with problems having a gun, knowing what these men were capable of and

13

how they treated women before.  This was an inherently dangerous situation.
[¶]  It is no surprise at all someone was shot and killed."

Regarding the special circumstance allegation, the prosecutor added:
"Jun Li committed a robbery here.  He intended that the robbery happen.
They wanted to get their loot.  They wanted to send their message, and he
wanted to get paid.  He also aided and abetted the others by helping handle
two different women, searching different rooms, et cetera, ensuring that
people were tied up.  He was one of the robbers while An Yan played the
customer.  [¶]  It's no mystery.  We know someone ended up shot, and we
know who did it, and there can be no legitimate dispute that Jun Li was a
major participant and showed reckless indifference to human life."

Li's defense counsel argued the prosecution had failed to prove that Li
acted with reckless indifference to human life or was a major participant in
the crime.

The jury returned a guilty verdict for first degree felony (robbery)
murder and found true that Li, "who was not the actual killer, with reckless
indifference to human life and as a major participant, did aid, abet, counsel,
command, induce, solicit, request, or assist the shooter in the commission of a
felony, [r]obbery, which resulted in the death of Xingjian Li, within the
meaning of Penal Code section 190.2(d)."

2.  Legal Principles

a.  Felony Murder and Felony-murder Special Circumstance

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.)
(Senate Bill 1437) " 'amend[ed] the felony murder rule and the natural and
probable consequences doctrine, as it relates to murder, to ensure that
murder liability is not imposed on a person who is not the actual killer, did
not act with the intent to kill, or was not a major participant in the

14

underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842, superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869; see also § 188, subd. (a)(3).)

Senate Bill 1437 added section 189, subdivision (e) (section 189(e)) to restrict the application of the felony-murder rule. (Stats. 2018, ch. 1015, § 3; see *People v. Curiel* (2023) 15 Cal.5th 433, 448.) "[S]ection 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' [citation] and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' [citation]. Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2' — that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*), quoting § 189(e).)

Section 190.2(d) states that if a felony-murder special circumstance is found true, the prescribed penalty of death or life in prison without the possibility of parole applies to "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor."

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court "provided substantial

15

guidance on the meaning of" major participation and reckless indifference to human life under section 190.2(d).[8] (*Strong*, *supra*, 13 Cal.5th at p. 703.)

Our Supreme Court explained that "[r]eckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.] Examples include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' [Citation.] Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 676–677 (*Scoggins*); see *Clark*, *supra*, 63 Cal.4th at p. 617.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677; see also *People v.*

---

[8] "[T]he major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions — *Enmund v. Florida* (1982) 458 U.S. 782 [] and *Tison v. Arizona* (1987) 481 U.S. 137 [] — that articulate the constitutional limits of capital punishment for accomplices to felony murder." (*People v. Emanuel* (2025) 17 Cal.5th 867, 882.)

*Hin* (2025) 17 Cal.5th 401, 449 (*Hin*) [examining whether the "jury's findings satisfy both the subjective and objective elements" of the section 189(e)(3) reckless indifference to human life mens rea requirement]; *id.* at p. 450 [and concluding that the evidence showed the defendant's "conduct created an objectively ' "grave risk of death" ' that satisfies the reckless indifference standard"].)

>                 b.   Jury Instructions

"In a criminal case, a trial court has a duty to instruct the jury on ' " ' "the general principles of law relevant to the issues raised by the evidence." ' " ' [Citation.] The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case. [Citations.] As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).)

The " 'language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*Estrada, supra*, 11 Cal.4th at p. 574; accord *People v. Ramirez* (2021) 10 Cal.5th 983, 1001.)

" ' "A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." ' " (*People v. Howard* (2024) 104 Cal.App.5th 625, 661 (*Howard*).) " ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular

17

instruction,' " ' " and " '[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.)

To prevail on a claim that an unrequested instruction was required, the defendant must show that the principle of law stated in the unrequested instruction was "necessary for the jury's understanding of the case." (*People v. Price* (1991) 1 Cal.4th 324, 442.)

### 3. Analysis

Li claims that the trial court erroneously instructed the jurors by omitting the objective component of reckless indifference to human life when stating " '[a] person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.' " (Italics omitted.) Li asserts that the court's failure to include language regarding whether a reasonable person would know that the defendant's criminal activity involves a grave risk of death (as set forth in the current versions of CALCRIM 540B and 703) "rendered the jury instructions incomplete and incorrect."

As noted *ante* (pt. II.A.1.), Li's defense counsel did not object to CALCRIM 540B or 703 as given and did not request any modification of the definition of reckless indifference to human life. Notwithstanding the Attorney General's assertion of forfeiture, we reach the merits of Li's appellate claim because he contends the jury instructions provided to the jurors were legally incorrect (in that they omitted an essential element of reckless indifference to human life) and affected his substantial rights. (See *Howard*, *supra*, 104 Cal.App.5th at p. 661.)

Regarding the merits of Li's claim, we are not persuaded that CALCRIM 540B and 703, as given, are legally erroneous. We agree with the

18

Attorney General that Li's challenge to the instant instructions is foreclosed by *Estrada*, *supra*, 11 Cal.4th 568. There, our Supreme Court addressed "whether a trial court has a sua sponte duty to define the phrase 'reckless indifference to human life' when instructing a jury regarding a felony-murder special-circumstance allegation against a defendant who is not the actual killer." (*Id.* at p. 572.) The *Estrada* court "conclude[d] that because a common understanding of the phrase 'reckless indifference to human life' amply conveys the meaning of section 190.2(d), a trial court is not required, in the absence of a request, to further explain the statutory phrase to the jury." (*Ibid.*) The court explained that "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony. This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in section 190.2(d), and as defined in *Tison*. The phrase therefore does not have a technical meaning peculiar to the law, and the trial court had no sua sponte duty to further define the statutory phrase for the jury."[9] (*Id.* at p. 578.)

The *Estrada* court suggested that if a request for clarification of the phrase " 'reckless indifference to human life' " is granted, a trial court should "instruct according to the rule set forth in the holding of [*Tison*], i.e., 'that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable

---

[9] As discussed *ante* (pt. II.A.2.a.), section 189(e) (the felony murder statute) incorporates by reference the definition of "reckless indifference to human life" from section 190.2(d). (§ 189(e)(3); see *In re Taylor* (2019) 34 Cal.App.5th 543, 561.) Thus, the *Estrada* court's interpretation of the phrase reckless indifference to human life applies to both statutes.

mental state.' " (*Estrada, supra*, 11 Cal.4th at p. 580; accord *Banks, supra*, 61 Cal.4th at p. 807, italics omitted ["Reckless indifference to human life 'requires the defendant be "subjectively aware that his or her participation in the felony involved a grave risk of death." ' "].)

In the instant case, the trial court instructed the jurors with language from former CALCRIM 540B and 703 that accords with *Estrada*'s recommendation about " 'knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Estrada, supra*, 11 Cal.4th at p. 580.) Li cites no California Supreme Court decision (and we are not aware of any) that expressly overrules *Estrada*. Under *Estrada*, the definition of reckless indifference to human life provided to Li's jury is legally correct and does not render the given instructions inadequate for a proper understanding of the reckless indifference to human life element in sections 189(e)(3) and 190(d).

Further, we are not convinced that our Supreme Court's post-*Estrada* decisions explicating the subjective and objective components of reckless indifference to human life render the instructions given in this case erroneous. Li does not cite any California appellate court decision holding that a jury must be instructed with language explaining both the subjective component and the objective component of reckless indifference to human life. In fact, in *Strong*, our Supreme Court noted that "the mandatory [jury] instructions [for a felony-murder special-circumstance finding] did not change in the wake of *Banks* and *Clark*" (*Strong, supra*, 13 Cal.5th at p. 719) and recognized that the bracketed language in CALCRIM 703 on the *Banks* and *Clark* factors is "optional." (*Strong*, at p. 719, fn. 4; see also Judicial Council of Cal., Crim. Jury Instns. (2026), Bench Notes to CALCRIM No. 540B, p. 289 & Bench Notes to CALCRIM No. 703, p. 428.)

Under extant precedent, we conclude the trial court satisfied its sua sponte duty and did not otherwise err when instructing the jurors on the principles of first degree felony murder and the felony-murder special circumstance.

Even assuming arguendo that the trial court should have instructed that reckless indifference to human life includes consideration of whether the defendant "engages in criminal activity that a reasonable person would know involves a grave risk of death" (CALCRIM 540B & 703), the circumstances of the instant case lead us to conclude the error was harmless under the beyond a reasonable doubt standard of *Chapman v. California* (1976) 386 U.S. 18.[10] (See *People v. Merritt* (2017) 2 Cal.5th 819, 831 [holding that a jury instruction omitting elements of robbery was subject to the *Chapman* harmless error standard]; see also *Neder v. United States* (1999) 527 U.S. 1, 9–10.)

The trial evidence overwhelmingly demonstrates that Li engaged in conduct when committing the San Jose crime that "created an objectively ' "grave risk of death." ' " (*Hin, supra,* 17 Cal.5th at p. 450.) Before Li entered the San Jose apartment, he participated in multiple crimes that involved guns, threats, and violence. Li also participated in the planning of the San Jose crime, which included him accepting a gun (along with Tao) and

---

[10] The Attorney General argues that because the jury was, in fact, instructed on the element of reckless indifference to human life, no requisite element of felony murder or the felony-murder special circumstance was omitted from the jury instructions and the failure to include language about the objective component of reckless indifference amounts to state law error subject to the prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818. Given our agreement with the Attorney General's further argument that any error was harmless even under the more stringent *Chapman* standard, we need not decide whether the *Watson* standard applies to Li's claim.

hearing Shen say that any resistance could be met with "shooting" and witnesses should be eliminated. After Yan had entered posing as a customer, Li proceeded to enter the apartment with Tao. Once inside, Li and Tao drew their guns and bound Y.G. and Xingjian Li. Tao beat Y.G. and asked about money. After Li and Tao told Yan to bind the two sex workers, Li and Tao took the women to the bedrooms and searched for money. When Xingjian Li freed himself and attempted to escape, Tao came out of a bedroom and shot Xingjian Li. Less than a minute later, Li exited a bedroom with a backpack and suitcase. Li took a "quick look" at Xingjian Li as he lay on the kitchen floor and then left the apartment with Yan and Tao. Yan told the group that he believed Xingjian Li had been hit by the gunshot because Yan "did feel blood." No one in the group called 911 or took any action to assist Xingjian Li.

Considering these facts, no rational juror could have found it unproven that a reasonable person would know Li's criminal activity involved a grave risk of death. Hence, we conclude that the failure to instruct the jurors on the objective component of reckless indifference to human life was harmless beyond a reasonable doubt. (See *Scoggins*, *supra*, 9 Cal.5th at p. 677; see also *People v. Ortiz* (2002) 101 Cal.App.4th 410, 416.)

B. *Multiple Victim Allegation*

Li asserts that the multiple victim One Strike allegations in counts 3 and 4 of the indictment were never proven, were not submitted to the jury, and are factually unsupported because counts 3 and 4 were committed against a single victim. Li acknowledges that the allegations have "no practical effect on [his] current sentence" but requests that this court dismiss them "to maintain a clear record of all the charges in this case and their dispositions." The Attorney General responds that Li has not articulated any

22

authority supporting the contention that the failure to submit the multiple victim allegations to the jury constitutes error.

### 1. Additional Background

The indictment includes multiple victim One Strike allegations for counts 3 and 4. (See § 667.61, subd. (e)(4).) At trial, following the close of evidence, the prosecutor stated on the record that the multiple victim allegations were not "supported by the evidence, and so that [they] will need to be stricken before the case is presented to the jury. We can address that and even perfect a copy of the [i]ndictment for the jury's purposes at a later point." The trial court replied "Okay." There is no indication in the record that the court formally dismissed the allegations or that a new indictment was prepared.

Counts 3 and 4 alleged sexual assault against the same victim. Neither the jury instructions nor the verdict forms for counts 3 or 4 mention the multiple victim allegations.

The probation report prepared for Li's sentencing states that the probation officer asked counsel about the status of the multiple victim allegations for counts 3 and 4. The prosecutor informed the probation officer that the multiple victim allegations attached to counts 3 and 4 had been dismissed "at the end of evidence," and "a count was dismissed at [the section] 995 [hearing] so the allegations no longer applied."

### 2. Analysis

We agree with the Attorney General that Li has failed to meet his burden on appeal of showing error with respect to the multiple victim allegations attached to counts 3 and 4 of the indictment. At trial, the prosecutor acknowledged on the record before the court (outside the presence of the jury) there was no evidence to support the allegations, and they should

be dismissed. The multiple victim enhancements were not referenced in the jury instructions, and they do not appear in the verdict forms. Although Li asserts that there may be confusion with respect to these allegations, he does not explain how or why. As Li does not explain the error or the necessity for a remedy, we decline to take any action on appeal with respect to this issue.

C. *Custody Credits*

Li contends that the trial court erred under section 2900.5, subdivision (b) (section 2900.5(b)) in failing to apply all of Li's presentence custody credits to the "aggregate sentence." Li acknowledges that he is not entitled to any more custody credits than those already awarded by the trial court, and the court's error was "a technical one." Nevertheless, Li asserts that it was error and this court should modify the judgment (and the sentencing minute order and abstracts of judgment) to reflect that Li's presentence credits apply to his "aggregate sentence." Specifically, Li asks this court to reverse the trial court's order that Li receive zero pretrial custody credits on counts 1, 2, 3, 6, and 9.

The Attorney General disagrees in part. The Attorney General states that, under section 669, when an indeterminate sentence is consecutive to a determinate term, the determinate term of imprisonment must be served first. The Attorney General argues that, because the trial court ordered that Li's indeterminate terms on counts 1, 3, and 4 be served consecutively to the aggregate determinate term sentence imposed on counts 2, 5, 6, 7, 8, 9, and 10, the trial court should have under sections 669 and 2900.5 awarded zero days of presentence custody credit on counts 1, 3, and 4 and 2,209 days on counts 2, 5, 6, 7, 8, 9, and 10.

### 1. Additional Background

The trial court pronounced an aggregate sentence of life without the possibility of parole consecutive to 25 years to life consecutive to 21 years. The court imposed the following sentences on the individual counts: on count 5, the middle term of six years with a consecutive 10-year enhancement under section 12022.53, subdivision (b) for a total term of 16 years; on count 2, one year (one-third of the middle term) to run consecutively; on count 6, two years (one-third of the middle term) to run consecutively; on count 7, the middle term of four years to run concurrently; on count 8, the middle term of five years to run concurrently; on count 9, two years (one-third of the middle term) to run consecutively; on count 10, the middle term of two years to run concurrently; on count 1, life without the possibility of parole, consecutive to "any other time," including 21 years on the "nonsex" determinate sentence counts; on count 3, a term of 25 years to life to run consecutively; and on count 4, a term of 25 years to life to run concurrently with count 3. The trial court stated that counts 3 and 4 were imposed pursuant to section 667.6, subdivision (c), and counts 2, 5, 6, 7, 8, 9, and 10 were imposed pursuant to section 1170.1.

The trial court awarded 2,209 days of pretrial custody credit for counts 4, 5, 7, 8, and 10 and zero good conduct days for a total of 2,209 days. On counts 1, 2, 3, 6, and 9, the court awarded zero days of pretrial custody credit.

### 2. Analysis

We review de novo the application of section 2900.5 to Li's sentence. " ' " 'We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd

consequences the Legislature did not intend.' " ' " (*People v. Cofer* (2026) 20 Cal.5th 1, 12.)

Under section 2900.5, defendants who serve time in custody prior to their sentencing "receive credit against their prison terms for all of those days spent in custody prior to sentencing, so long as the presentence custody is attributable to the conduct that led to the conviction." (*People v. Duff* (2010) 50 Cal.4th 787, 793 (*Duff*).)[11]  Section 2900.5(b) states in relevant part, "For the purposes of this section . . . [c]*redit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed*" (italics added).

Our Supreme Court has stated that the italicized language "does no more than clarify that when consecutive terms are imposed for multiple offenses in a single proceeding, only one of the terms shall receive credit for presentence custody." (*People v. Bruner* (1995) 9 Cal.4th 1178, 1192, fn. 9.) Thus, if sentences are imposed consecutively in a single proceeding, dual credits are expressly prohibited by statute.

Section 669, subdivision (a) provides, in part:  "Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first."

---

[11] Some defendants may earn additional credits for work and good conduct during presentence incarceration (§§ 2900.5, subd. (a), 4019).  Li did not earn any presentence conduct credit because he was convicted in count 1 of murder.  (See § 2933.2, subd. (c); *Duff*, *supra*, 50 Cal.4th at p. 794, italics omitted ["Subdivision (a) [of section 2933.2] prohibits persons convicted of murder from earning postsentence worktime credit, and subdivision (c) of the statute prohibits such persons from earning conduct credit for periods of presentence incarceration."].)  Li does not challenge the trial court's denial of presentence conduct credit.

26

Three separate sentencing schemes governed Li's sentencing.  For his conviction for murder (count 1), his indeterminate sentence was dictated by sections 190 and 190.2(a).  For his convictions for rape in concert (count 3) and oral copulation in concert (count 4), his indeterminate sentences were supplied by the One Strike law.  (See § 667.6, subd. (c); *Vaquera, supra*, 15 Cal.5th at p. 724 ["[T]he trial court must impose a One Strike sentence when a One Strike allegation is properly pled and proved."].)  His determinate sentences for counts 2, 5, 6, 7, 8, 9, and 10 were governed by sections 1170 and 1170.1.

The trial court pronounced an aggregate determinate term of 21 years on counts 2, 5, 6, 7, 8, 9, and 10.  It also pronounced the statutorily required sentence of life without the possibility of parole on count 1, and 25 years to life on counts 3 and 4.[12]

The trial court's election to sentence the three groups of convictions consecutively triggered the ban on dual custody credits in section 2900.5(b), which directs a sentencing court to award credit "only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."

Li's sentence falls squarely under this restriction.  Li's presentence custody was a single period of custody attributable to multiple offenses, and he received consecutive sentences.  By its plain language, section 2900.5(b) allows for custody credits to be applied "only once."  (See *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1415, italics omitted ["Section 2900.5, subdivision (b), only permits credit to be awarded 'once' when consecutive

---

[12] The trial court ordered the sentences on counts 3 and 4 to run concurrently with each other but consecutively to the other counts of conviction.

sentences are imposed as occurred here."].) Thus, the pretrial custody credits could only be imposed on one of the three terms he received: the 21-year determinate term, the term of life without the possibility of parole (for count 1), or the term of 25 years to life (for counts 3 and 4).

Li cites no published authority for the proposition that the trial court should have awarded custody credits to all of the determinate *and* indeterminate terms simply because they eventually resulted in a single "aggregate sentence." We are not aware of any precedent to this effect, and it does not comport with section 2900.5(b)'s plain language. We reject his interpretation of the statute.

Nevertheless, we agree with the Attorney General that the trial court erred in awarding pretrial custody credits for Li's conviction on count 4, and in failing to award them for his convictions on counts 2, 6, and 9.

Section 669 requires that when a person is sentenced to a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term shall be served first. Although the record is not entirely clear, it appears the trial court intended to apply the pretrial custody credits to the aggregate determinate term. Therefore, the trial court should have awarded pretrial custody credits on all the counts comprising the determinate term (counts 2, 5, 6, 7, 8, 9, & 10). Conversely, having sentenced the indeterminate terms consecutively, the trial court erred under section 2900.5(b) in awarding *any* pretrial custody credits on the counts comprising the indeterminate terms (counts 1, 3, and 4).

We will therefore direct the trial court to amend the sentencing minute order and abstracts of judgment to award 2,209 days of presentence custody credits on counts 2, 5, 6, 7, 8, 9, and 10 (§ 2900.5(a)) and zero days of presentence custody credits on counts 1, 3, and 4 (§ 2900.5(b)).

28

D. *Abstract of Judgment*

Li asserts that the abstract of judgment incorrectly describes the jury's true findings under section 190.2(d) and 667.61 as sentencing "enhancements." He requests that they be stricken from section 2 of the abstract of judgment for his indeterminate sentences. The Attorney General agrees, as do we.

The jury's true findings pursuant to sections 190.2(d) and 667.61 are penalty provisions that exposed Li to greater punishment than would be authorized by a verdict on the underlying offense alone;[13] they were not sentencing enhancements. (See *People v. Boswell* (2016) 4 Cal.App.5th 55, 60 [section 190.2]; *People v. Acosta* (2002) 29 Cal.4th 105, 117 [section 667.61].) They should not be so described in the abstract of judgment. We will direct the trial court to delete the entries under "enhancements" in part 2 of Li's indeterminate abstract of judgment.

## III.  DISPOSITION

The judgment is affirmed. The trial court is directed to correct the minute order for Li's sentencing to reflect an award of 2,209 days of pretrial custody credits on counts 2, 5, 6, 7, 8, 9, and 10, and zero days of pretrial custody credits on counts 1, 3, and 4. The trial court is also ordered to prepare an amended determinate felony abstract of judgment to reflect 2,209 days of pretrial custody credits. The trial court is further directed to prepare an amended indeterminate felony abstract of judgment to reflect zero days of pretrial custody credits and to indicate no sentencing enhancements for counts 1, 3, and 4.

---

[13] "A penalty provision 'sets forth an alternate penalty for the underlying felony itself, when the jury has determined that the defendant has satisfied the conditions specified in the statute.' " (*People v. Jones* (2009) 47 Cal.4th 566, 576, italics omitted.)

The trial court is directed to send a copy of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

_____

                                Danner, J.

WE CONCUR:

_____

Greenwood, P. J.

_____

Chung, J.[*]

**H052909**
*People v. Li*

[*] Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.